IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | HONORABLE JEROME B. SIMANDLE |
| v. | Criminal Action No. 13-121-1 (JBS) |
| JOHN LEADBEATER, | |
| Defendant. | **OPINION** |

APPEARANCES:

Paul J. Fishman, United States Attorney
    By: Jacqueline Carle, Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
401 Market Street, 4th Floor
Camden, NJ 08101
    Attorney for the United States

Thomas J. Cammarata, Esq.
CAMMARATA, NULTY & GARRIGAN LLC
549 Summit Ave.
Jersey City NJ 07306
    Attorney for Defendant John Leadbeater

**SIMANDLE, Chief Judge:**

**I.    INTRODUCTION**

Defendant John Leadbeater stands accused of one count of
conspiracy to commit wire fraud in violation of 18 U.S.C. §
1349, and one count of conspiracy to commit money laundering in
violation of 18 U.S.C. § 1956(h). The Superseding Indictment,
filed on March 20, 2013, alleges that Leadbeater profited from

the sale of ocean-town condominiums overbuilt by financially
distressed developers by obtaining mortgage loans using
fraudulent loan applications, fraudulent HUD-1 Settlement
Statements, and other documents, and by using straw purchasers
who had good credit but who would not pay deposits or closing
costs and/or would not manage the properties or make mortgage
payments on them.

Before the Court are motions in limine by the United States
[Docket Items 39, 44, & 68], Defendant Leadbeater [Docket Item
38], and co-Defendant Daniel Cardillo [Docket Items 40 & 42].[1]
The Court will address each in turn.

## II.  BACKGROUND

The Superseding Indictment identifies 26 allegedly
fraudulent real estate transactions from 2006 to 2008 involving
Defendant Leadbeater that followed two general patterns. The
first pattern involved same-day closings, in which Leadbeater
would purchase the property "dry," meaning that little or no
funds were produced for the transaction, and then a straw
purchaser would purchase the same property on the same day at a
substantially increased sales price, using false documents.
(Superseding Indictment [Docket Item 15] ¶ 19.) Leadbeater

---

[1] A separate Opinion and Order will be entered adjudicating the
motions as they pertain to Defendant Cardillo, whose trial has
been severed from that of Defendant Leadbeater.

allegedly directed title clerks to prepare documents for the closings, including fraudulent HUD-1 Uniform Settlement Statements signed by the straw purchasers "reflecting deposits and funds brought to closing by the Straw Purchaser that had never been made." (Id. ¶ 19(e).) The title companies allegedly distributed proceeds of fraudulently obtained mortgage loans to the conspirators by wiring funds into an account controlled by Leadbeater or by issuing a check made payable to one of Leadbeater's companies, such as BCJL Enterprises or Lead 1 Investments. (Id. ¶ 19(f).)

The second pattern involved fraudulent line-item payments off of the HUD-1 Settlement Statements. (Id. ¶ 20.) According to the Superseding Indictment, Leadbeater and co-conspirators recruited a straw purchaser to buy real estate "at a sales price that included a substantial increase to cover a pay-out" to Leadbeater or his co-conspirators. (Id. ¶ 20(b).) Again, the straw purchasers obtained loan applications with false documentation, and attended closings at which Leadbeater directed the title clerks to prepare documents and distribute proceeds to Leadbeater or his companies, or to a co-conspirator's company. (Id. ¶ 20(c)-(e).) Defendant Cardillo is alleged to be one of the straw purchasers. Pursuant to the Court's Order [Docket Item 60], Cardillo will be tried separately following the trial of Defendant Leadbeater.

The Superseding Indictment also charges Leadbeater with a conspiracy to commit money laundering, by causing $13 million in allegedly fraudulent mortgage loans to be funded. (Id. at 21 ¶ 3.) Conspirators allegedly extracted funds from the title company's escrow account and wired money or issued checks to Leadbeater and co-conspirators, who, in turn, transmitted a portion to straw purchasers. (Id.)

Defendant Leadbeater brings several motions in limine, joins others brought by Defendant Cardillo, and opposes motions filed by the Government. Specifically, Leadbeater seeks disclosure from the Government of certain material, including any potentially exculpatory evidence known to the Government and prior bad act evidence that the Government intends to use at trial. He seeks an order for Government agents to preserve and produce rough interview notes of Government witnesses and for the Government to produce original documents as evidence. Leadbeater also seeks to dismiss Count I of the Superseding Indictment because it is time-barred and because it is duplicitous, meaning that it charges more than one conspiracy in a single count, in violation of Fed. R. Crim. P. 8(a). He also brings a motion to strike surplusage from the Superseding Indictment.

The Government moves to admit certain evidence against Leadbeater under Fed. R. Evid. 404(b); to preclude Leadbeater

4

from arguing in favor of jury nullification; to preclude him
from arguing that a lack of diligence by the victim lenders is a
defense to the charged offenses; to preclude him from referring
to the national foreclosure crisis and the Government's actions
to resolve it; to preclude him from raising a defense based on
an assignment-of contract theory; and to preclude him from
arguing the affirmative defense of reliance on counsel. The
Court heard oral argument on these motions and invited
supplemental briefing related to the statute of limitations
question.

**III. DISCUSSION**

### 1. Duplicity of Count I

Both Defendants argue that Count I, which lists 26 separate
real estate transactions, actually "charges a series of separate
and distinct conspiracies lumped together in this one count in
violation of Fed. R. Crim. P. 8(a)." (Leadbeater Mot. at 10.)
Rule 8 provides: "The indictment . . . may charge a defendant in
separate counts with 2 or more offenses if the offenses charged
. . . are of the same or similar character, or are based on the
same act or transaction, or are connected with or constitute
parts of a common scheme or plan." Fed. R. Crim. P. 8(a).

The Third Circuit employs a three-step inquiry for
determining whether there are multiple conspiracies charged in a
single count:

> First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.

United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989) (citations and quotation marks omitted); see also United States v. Kemp, 500 F. 3d 257, 287 (3d Cir. 2007) (quoting Kelly). The Third Circuit has held that a conviction must be vacated when "(1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." Kemp, 500 F.3d at 287 (quoting Kelly, 892 F.2d at 258).

Leadbeater argues there was no common goal among the Defendants and the co-conspirators, many of whom had no connection to each other. (Id. at 16-17.) He argues that the indictment alleges two patterns of transactions: one involving same-day closings, the other involving fraudulent line item payments off of the HUD-1 Settlement Statements. (Id. at 10-11.) He argues that the charged transactions involve different buyers, sellers, mortgage brokers, and lenders, and different forms of alleged fraud. (Id. at 16.) While some of the individuals overlapped in some of the transactions, Leadbeater argues that "there was never a fusion into a single enterprise." (Id. at 17.) He cites United States v. Cambindo Valencia, 609

6

F.2d 603, 626 (2d Cir. 1979), for the proposition that the alleged co-conspirators must be "fused into a single enterprise." (Id. at 18.)

Leadbeater also analogizes this case to Kotteakos v. United States, 328 U.S. 750 (1946), in which the defendants allegedly fraudulently obtained loans and advances offered by the Federal Housing Administration. In that case, there was one central figure who knew all of the co-conspirators and who pleaded guilty, but the Supreme Court found several conspiracies existed because the defendants could be clustered into separate, independent groups. Kotteakos, 328 U.S. at 758. The Court stated that the "dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." Id. at 774. Leadbeater argues that this case is similar: that the Government has alleged several spokes meeting at a hub (in the figure of Leadbeater), but no rim to enclose the wheel, leaving independent conspiracies emanating from Leadbeater. (Leadbeater Mot. at 18.) The Supreme Court later summarized Kotteakos, saying that multiple conspiracies existed in that case because "no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies

7

therefore were distinct, not parts of a larger general scheme .
. . .” Blumenthal v. United States, 332 U.S. 539, 558 (1947). In
Blumenthal, by contrast, a single conspiracy existed where the
defendants were "all involved in a scheme to acquire whiskey and
resell it above authorized prices," and "all the conspirators
'knew of and joined in the overriding scheme' and 'sought a
common end' to sell the whiskey, so that 'the several agreements
were essential and integral steps.'" Kemp, 500 F.3d at 288
(summarizing Blumenthal).

The Government argues that the indictment charges a single
conspiracy under the Kelly test. First, the conspirators had a
common goal: "to make money through mortgage fraud." (Gov. Opp'n
at 12.) The Government recognizes that the Defendants and co-
conspirators did not achieve this goal using a single method,
but both patterns involved inflated sale prices to allow
conspirators to profit from the difference between the sales
price and buyout price; both required the participation of straw
purchasers with good credit; both required mortgage brokers to
prepare false and fraudulent loan applications; both required
title clerks to prepare documents for the closings, including
HUD-1 Settlement Statements; and both required the title
companies to distribute proceeds to conspirators by wiring funds
into an account controlled by Leadbeater. (Id. at 12-13.)
Second, the Government argues that each group of co-conspirators

8

was necessary or advantageous to the success of another aspect of the scheme or the overall success of the venture, and argues that a "single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in its membership." (Id. at 13-14, quoting Kelly, 892 F.2d at 259.) Third, the Government argues that the co-conspirators overlap in several transactions and that the Government "need not prove that each defendant knew all the details, goals or other participants" to prove a single conspiracy. (Id. at 14, quoting United States v. Theodoropoulus, 866 F.2d 587, 593 (3d Cir. 1989), overruled on other grounds, United States v. Price, 76 F.3d 526 (3d Cir. 1996).) In sum, the Government argues that Count I "properly alleges: (1) a common goal; (2) among overlapping co-conspirators, (3) whose continuous cooperation was required for the conspiracy to continue." (Gov. Opp'n at 16.)

The Court agrees with the Government that Count I of the Superseding Indictment, on its face, alleges the existence of a single conspiracy. With Leadbeater at the center, the alleged conspiracy involved overlapping groups of co-conspirators who effectuated mortgage fraud in one of two ways, and both methods shared several similar intermediary steps. In both cases, the object of the conspiracy was "to profit from the sale of ocean town condominiums overbuilt by financially distressed developers

9

in Wildwood and Wildwood Crest, New Jersey by obtaining mortgage loans for unqualified borrowers using fraudulent loan applications, HUD-1 Settlement Statements, and other documents." (Superseding Indictment at 11 ¶ 9.)

Leadbeater's arguments are unpersuasive at this stage of the proceeding. A count is not duplicitous simply because it alleges that a crime was effectuated in two different manners. See United States v. Smith, 789 F.2d 196, 200 (3d Cir. 1986) ("the court below properly instructed the jury that it could find that there was one master conspiracy and more than one subsidiary scheme") (citing Unites States v. Kenny, 462 F.2d 1205, 1261 (3d Cir. 1972)); see also Fed. R. Crim. P. 7(c) ("A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means."). Nor is Count I duplicitous because some allegedly fraudulent transactions affected "financial institutions," within the meaning of the wire fraud statute, and others did not. See Braverman v. United States, 317 U.S. 49, 54 (1942) ("The allegation in a single count of a conspiracy to commit several crimes is not duplicitous for 'The conspiracy is the crime, and that is one, however diverse its objects'."); United States v. Morrow, 717 F.2d 800, 804 (3d Cir. 1983) ("a single conspiracy may have multiple goals and objectives") (citing Braverman, 317 U.S. at 53-54.) The

10

allegation that different subsets of co-conspirators were
involved in different transactions does not render Count I
duplicitous. See Kelly, 892 F.2d at 259 ("A single conspiracy is
not transformed into a series of unrelated multiple conspiracies
merely through a change in its membership."); United States v.
Marszalkowski, 669 F.2d 655, 659-60 (11th Cir. 1982) ("A single
conspiracy, however, may exist even if not all conspirators take
part in all aspects of the scheme."). Not all members of a
conspiracy need to know all of the other co-conspirators,
Theodoropoulus, 866 F.2d at 593, and not all need to take part
in all aspects of the scheme. Marszalkowski, 669 F.2d at 659-60
("A single conspiracy, however, may exist even if not all
conspirators take part in all aspects of the scheme."). Because
the indictment alleges one overarching conspiracy, with
overlapping groups of co-conspirators working toward a common
goal, the Court cannot dismiss Count I as duplicitous as a
matter of law.

     Leadbeater seems to anticipate that the Government's
evidence at trial will establish the existence of multiple
conspiracies, not the single conspiracy charged. The Court
cannot, as a matter of law, make a determination now whether
there will be a variance between the Superseding Indictment and
the evidence the Government will adduce at trial. Such a ruling
would be based on improper speculation about the Government's

evidence. <u>See</u> <u>United States v. Hornick</u>, No. 08-cr-412-03, 2009
WL 3233109, at *2 (E.D. Pa. Oct. 6, 2009) (holding that,
pretrial, it was "premature" to decide whether "a potential
variance exists between the indictment, which charges one
conspiracy, and the proof, which the defendant suggests might
show multiple conspiracies"); <u>United States v. Pavden</u>, 613 F.
Supp. 800, 808 (S.D.N.Y. 1985) (rejecting a pretrial attempt to
determine whether a variance would exist between the indictment
and the evidence proved at trial, stating "[a]t this juncture .
. . the court is not in a position to judge the nature and the
weight of the evidence to be introduced at trial"); <u>accord</u>
<u>Kelly</u>, 892 F.2d at 258 (discussing "a variance between the
indictment and the <u>proof</u> <u>presented</u> <u>at</u> <u>trial</u>") (emphasis added).
Ultimately, "[t]he question of whether a single conspiracy or
multiple conspiracies existed is a fact question to be decided
by the jury." <u>United States v. Smith</u>, 789 F.2d 196, 200 (3d Cir.
1986). After the prosecution rests, Leadbeater may renew this
motion, if the evidence proves multiple conspiracies and that a
substantial right of his was prejudiced by the variance between
the proof and the indictment. At this time, the Court will deny
Leadbeater's motion without prejudice.

### 2. Statute of limitations

Leadbeater joins Defendant Cardillo's argument that this prosecution is barred by the statute of limitations. (Leadbeater Opp'n [Docket Item 41] at 2.)

Generally, for non-capital offenses, a five-year statute of limitations applies to federal criminal prosecutions. See 18 U.S.C. § 3282(a) ("no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed"). However, 18 U.S.C. § 3293 extends the statute of limitations to 10 years for offenses related to financial institutions, including a conspiracy to commit wire fraud that "affects a financial institution" under 18 U.S.C. § 1343, as is charged here. See 18 U.S.C. § 3293(2) ("No person shall be prosecuted, tried, or punished for . . . a conspiracy to violate . . . section 1341 or 1343, if the offense affects a financial institution . . . unless the indictment is returned or the information is filed within 10 years after the commission of the offense."); 18 U.S.C. § 20 (defining "financial institution"). In 2009, Congress amended the definition of "financial institution" to include "a mortgage lending business . . . or any person or entity that makes in whole or in part a federally related mortgage loan." 18 U.S.C. § 20(10) (2009). A lender such as

13

Countrywide Home Loans, for example, was not a "financial institution" within this statutory framework at the time of the relevant transactions.

Leadbeater argues that

the majority of the lenders do not fit the definition of a 'financial institution' that existed prior to the 2009 amendment to 18 U.S.C. § 20 . . . . Any of the transactions that involved mortgage lenders that predated March 20, 2008 (the five-year date from the return of the indictment) must be dismissed.

(Leadbeater Opp'n at 2.)

At least six of the charged 26 transactions involved FDIC insured banks as the mortgage originator, which clearly qualify as transactions affecting financial institutions and are governed by a 10-year limitations period.[2] (Gov. Opp'n at 21; Superseding Indictment at 15-17.) None of the transactions identified in the Superseding Indictment occurred more than 10 years before the Superseding Indictment was filed in March 20, 2013. One transaction is timely under even the five-year statute of limitations. (See id. at 17) (identifying a transaction on March 26, 2008). Because the Superseding Indictment alleges a single conspiracy in Count I, and at least one of the allegedly

---

[2] The properties are: 5501 Atlantic Avenue, Units 204, 205 and 207; 4601-05 Niagra Avenue, Unit 200; 411 E. Buttercup Road, Unit 103; and 309 E. Poplar Avenue. The mortgages were obtained through IndyMac Bank, FSB; Wells Fargo Bank, N.A.; Washington Mutual Bank; JP Morgan Chase; and American Partners Bank. (Superseding Indictment at 15-17.)

fraudulent real estate transactions is timely under either limitations period, the charge of conspiracy in Count I is timely.[3] Leadbeater's motion to dismiss Count I is denied.

### 3. Immediate disclosure of Brady material

Defendants request immediate production of Brady material. (Leadbeater Mot. [Docket Item 38-3] at 3; Cardillo Mot. [Docket Item 40-1] at 2 (joining the Leadbeater motions).) The Government responds that it "has already disclosed to defense counsel all information known to members of the prosecution team that tends to exculpate the defendants." (Gov. Opp'n [Docket Item 45] at 7.) The Government pledges to disclose promptly any material exculpatory information of which a member of the prosecution team becomes aware. (Id. at 6.) At oral argument, the parties agreed that the Brady motion was moot. Therefore, the motion is denied as moot.

### 4. Disclosure of Giglio & Jencks material

Both Defendants request Giglio and Jencks material to be provided 30 days before trial.[4] (Leadbeater Mot. [Docket Item 38-3] at 3; Cardillo Mot. [Docket Item 40-1] at 2.) At oral

---

[3] It is incumbent on the Government to prove at trial that at least one overt act in furtherance of the conspiracy was undertaken within the limitations period, and this will be included in the Jury Instructions.

[4] Defendants mention both 30 days and 60 days in the briefs. Compare Leadbeater Mot. at 3 (60 days) with Notice of Pretrial Motions [Docket Item 38] at 1 (30 days).

argument, the Government agreed to produce Giglio and Jencks material at least 14 days before the start of the trial, and the Defendants voiced no objection to that schedule. Therefore, the Court will order the Government to produce Giglio and Jencks material at least 14 days before the start of the trial.

### 5. Preserve rough interview notes of all Government witnesses

Defendants request that the Government preserve and produce all rough interview notes of Government witnesses. (Leadbeater Mot. at 7.) The Government replies that it will abide by the obligation under United States v. Ammar, 714 F.2d 238, 259 (3d Cir. 1983) to preserve interview notes and handwritten drafts of reports, and has instructed its agents to preserve notes. (Gov. Opp'n at 7.) But the Government argues the motion is moot because "the United States is unaware of any Brady material in its possession, including any agent notes, and neither defendant proffers any evidence suggesting otherwise." (Id.)

At oral argument, the parties did not object to the suggestion that this motion should be denied as moot. Accordingly, the motion is denied as moot.

### 6. Disclosure of 404(b) evidence

Defendants request early disclosure of Fed. R. Evid. 404(b) material. (Leadbeater Mot. at 8; Cardillo Mot. at 21-22.) The Government brought its own motions to admit 404(b) evidence

16

[Docket Items 39 & 44], and represents that it does not intend to seek admission of other 404(b) evidence. (Gov. Opp'n at 11.) As defendants acknowledged at oral argument, this motion is moot.

### 7. Use of original documents

Leadbeater argues that he contests "the authenticity of the closing documents" related to the 26 transactions named in the indictment and that "[m]any of the documents contain signatures which are purporting to be the signatures of Leadbeater which defendant denies signing." (Leadbeater Mot. at 18–19.) Leadbeater requests that, pursuant to Fed. R. Evid. 1002 the Government be required to produce original documents for review of counsel and for presentation at trial. (Id. at 19.)

At oral argument, the Government re-extended an invitation for defense counsel to inspect the documents in its possession. Therefore, the Court will deny this motion without prejudice. The Government shall make the documents available for inspection, if it has not already done so, and defense counsel may raise any specific disputes about chain of custody or authenticity in a pretrial motion.

### 8. Surplusage in the indictment

Defendants object to "surplusage" in Paragraph 9 of the Indictment, which states: "The object of the conspiracy, which caused more than thirteen million dollars of losses to various

17

Lenders, was to profit from the sale of ocean town condominiums
. . . ." (Leadbeater Mot. at 19-20; Superseding Indictment
[Docket Item 15] ¶ 9.) Defendants argue that the reference to
$13 million is "prejudicial," "inflammatory," and "inaccurate,"
because "[a]lthough the total amount of the mortgages funded may
exceed the thirteen million dollars figure (Ind. Count 2 ¶ 3),
this does not represent the losses incurred by lenders."
(Leadbeater Mot. at 20.)

At oral argument, the parties agreed to replace the
quantification of losses in Paragraph 9 on page 11 of the
Superseding Indictment with a statement that $13 million worth
of fraudulent loans were funded. The Government agreed to submit
a consent order with the new language. Accordingly, the motion
is denied as moot, in light of the forthcoming consent order.

### B. The Government's motions

#### 1. Jury nullification

The Government seeks to foreclose certain arguments or
legal theories that Defendants may present to the jury,
including jury nullification. The Government argues that jury
nullification is a violation of a juror's sworn duty to follow
the law. See United States v. Boone, 458 F.3d 321, 329 (3d Cir.
2006) (stating that it is "manifest . . . that a juror who
refuses to deliberate or who commits jury nullification violates
the sworn oath and prevents the jury from fulfilling its

18

constitutional role"); <u>Kemp</u>, 500 F.3d at 304 ("we hold that the district courts may discharge a juror for bias, failure to deliberate, failure to follow the district court's instructions, or jury nullification when there is no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence"). Accordingly, the Court will grant the Government's motion insofar as it precludes Defendant from arguing the theory of nullification to the jury. This holding does not in any way inhibit Defendants from cross-examining Government witnesses and from pursuing questions to reveal bias, including whether Government witnesses were prosecuted or made deals with prosecutors in exchange for their testimony.

### 2. Blaming the victim lenders and referring to the foreclosure crisis

The Government seeks to foreclose Defendants from arguing that the victim lenders were negligent or intentionally failed to scrutinize the loan applications at issue in this case. The Government also seeks to prevent Defendants from arguing about or adducing evidence of the foreclosure crisis and the government's actions to resolve it. The Government argues that blaming the victim lenders does not negate any element of the charged offenses and is therefore irrelevant and potentially confusing to a jury. The Government also argues that its response to the foreclosure crisis is irrelevant to whether

Defendants conspired to commit fraud. (Gov. Mot. [Docket Item 39] at 6-21.)

Defendants oppose the motion on the grounds that it would impinge on Defendant's right to cross-examination. Leadbeater argues that lines of questioning should be ruled upon as they arise, and not prematurely. (Leadbeater Opp'n [Docket Item 41] at 6.) Leadbeater argues that "the government seeks to restrict the defendant's ability to prove the bias and motive of witnesses when it suggests that the defense should be prevented from examining a witness regarding the fact that he or she has participated in a crime and has not been charged . . . ." (Id. at 9.) Leadbeater further argues that he should be permitted to cross-examine lender witnesses about the procedures they followed and diligence they used in proofing the information received. (Id. at 11.)

Defendant Cardillo adds that the Government "must establish materiality of any alleged misrepresentation," and because Countrywide's agents did not attempt to verify any information supplied by Defendants, any misrepresentations were not material. (Cardillo Opp'n at 3-6.) Cardillo contends Countrywide had a policy of indifference to the facts supplied by mortgage-seekers -- and that the Government has taken this position in other litigation against Countrywide. (Id. at 5-7.) Cardillo's only illuminating citation is United States v. Newmark, 374 F.

20

App'x 279, 283 (3d Cir. 2010), in which the Third Circuit was critical of the district court's instruction to the jury but did not find plain error that prejudiced the jury's deliberation. In Newmark, the district court did not give an instruction defining a scheme to defraud as a scheme "reasonably calculated to deceive persons of ordinary prudence and comprehension," but rather instructed the jury that "[i]t is immaterial that the alleged victims may have acted gullibly, carelessly, naively or negligently, which led to their being defrauded." Id. The Third Circuit ruled that the materiality instruction "concerns whether a reasonable person would consider a fact important, whereas the 'ordinary prudence' instruction concerns whether a reasonable person would be deceived by a scheme." Id. In Newmark, the lack of the ordinary prudence instruction did not prejudice the defendant.

The elements of wire fraud under 18 U.S.C. § 1343 are: (1) that the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises, or by willfully participating in such a scheme with knowledge of its fraudulent nature; (2) that the defendant acted with the intent to defraud; and (3) that in advancing the scheme, the defendant transmitted any writing, signal or sound by means of a wire in interstate commerce or caused the transmission of any writing, signal or

sound by means of a wire in interstate commerce. See Model
Criminal Jury Instructions for the Third Circuit § 6.18.1343
(2014). The elements of conspiracy to commit wire fraud under 18
U.S.C. § 1349 are (1) an agreement between two or more persons
to commit wire fraud, (2) the defendant knowingly joined the
conspiracy, and (3) one of the conspirators committed an overt
act in furtherance of the conspiracy. See United States v.
Gebbie, 294 F.3d 540, 544 (3d Cir. 2002) (reciting these
elements in the context of mail fraud under 18 U.S.C. § 1341);
United States v. Mitan, Nos. 08-760-1 & 08-760-2, 2009 WL
3169119 at *12 (E.D. Pa. Sept. 23, 2009) (citing Gebbie in
reciting the elements of conspiracy to commit wire fraud).

     The Government need not show that the lenders were actually
duped; they need to show that Defendants had an agreement to
defraud. See Neder v. United States, 527 U.S. 1, 24-25 (1999)
("The common-law requirement[] of 'justifiable reliance' . . .
plainly ha[s] no place in the federal fraud statutes"); United
States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The
negligence of the victim in failing to discover a fraudulent
scheme is not a defense to criminal conduct."). The scheme "need
not be fraudulent on its face but must involve some sort of
fraudulent misrepresentations or omissions reasonably calculated
to deceive persons of ordinary prudence and comprehension."
Coyle, 63 F.3d at 1243. A false or fraudulent representation

22

must relate to a material fact or matter, meaning that the statement was one that a reasonable person might have considered important in making his or her decision. See Model Criminal Jury Instructions for the Third Circuit § 6.18.1341-1 (2014); see also United States v. Hannigan, 27 F.3d 890, 892 n.1 (3d Cir. 1994) (stating that specific intent to defraud may be inferred from "a material misstatement of fact made with reckless disregard for the truth").

Defendants' theory that the victim lenders abandoned any meaningful review of the loan application documents and therefore did not rely on the Defendants' representations does not and could not negate liability in this case. The Government need only prove (1) that Leadbeater agreed with at least one other person to commit wire fraud, (2) that he knowingly joined the conspiracy, and (3) that one conspirator committed an overt act in furtherance of the conspiracy. The underlying offense of wire fraud requires a showing of intent to defraud and a material false or fraudulent misrepresentation, but that merely requires showing that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension, Coyle, 63 F.3d at 1243, and that a reasonable person might have considered the representation important in making his or her decision. Whether the victim lenders reviewed Defendants' allegedly fraudulent loan applications, or whether the lenders

23

used appropriate care in reviewing them, is of no import, so long as the co-conspirators agreed to submit applications that included a material misrepresentation that was reasonably calculated to deceive persons of ordinary prudence and comprehension. False representations about income and employment on loan applications, for example, are material misrepresentations that are reasonably calculated to deceive persons of ordinary prudence. Therefore, the Government may establish Leadbeater's liability regardless of how closely the victim lenders scrutinized the loan applications.

The Court will grant the Government's motion in part. Defendants may not argue in opening statements, or elicit testimony on direct examination, about the lack of diligence on the part of the victim lenders. Such arguments and evidence would confuse the issues for the jury. The charge here is conspiracy, which turns on the agreement between the Defendants and others, their intent, and whether any overt act was taken by a conspirator in furtherance of the conspiracy. However, if the Government witnesses testify that they relied on the representations in the loan applications, Defendants may cross-examine the witnesses on this reliance. It would be premature to strictly define the scope of cross-examination at this time. What is sufficiently clear at this juncture is that Defendants may not seek to blame the banks or mortgage companies for the

mortgage crisis as a theory to escape liability, or suggest that the banks or mortgage companies were not sufficiently careful or prudent in protecting themselves from fraud, or to adduce irrelevant evidence about the foreclosure crisis and the Government's response.

### 3. Assignment-of-contracts and reliance-on-counsel defenses

The Government anticipates that Leadbeater will argue that "language added by Leadbeater in some real estate contracts relevant to this case" concerning assignment of the contracts "negates Leadbeater's intent to commit wire fraud." (Gov. Mot. at 24.) The Government seeks to bar this defense because "it fails to advance the inquiry into whether John Leadbeater, Daniel Cardillo and others conspired to commit wire fraud or whether John Leadbeater conspired with others to commit money laundering." (Id.) The Government also seeks a hearing under Rule 104, Fed. R. Evid., to test the sufficiency of Defendants' evidence "to show that the defendant relied on a lawyer's advice in good faith" and that "[f]ailure to produce such evidence should likewise preclude the defense." (Id. at 27, 30.) The Government acknowledges that "whether a defendant relied in good faith on the advice of counsel and therefore did not act willfully is a question of fact to be resolved by the jury." (Id. at 28.) But the Government contends that the defense will

25

not be able to prove that Leadbeater "disclosed to his attorney every fact relevant to the formation of the attorney's advice" and that he "relied on a lawyer's advice in good faith." (Id. at 29-30.) Leadbeater objects that it is premature to preclude such testimony, as no defense along these lines has been raised, and the Court should not hamstring the defense's ability to raise these issues on cross-examination.

It would be premature for the Court to decide this issue now. Defendants have not advanced either theory of defense yet, and thus there is nothing for the Court to decide today. The motion is denied without prejudice, and the Government may renew the motion if necessary.

### 4. Rule 404(b) evidence against Leadbeater

The Government seeks admission of evidence about two real estate transactions not charged in the Superseding Indictment, pursuant to Rule 404(b), Fed. R. Evid. The first involved a condominium purchase in March 14, 2006, by Richard Leadbeater, John Leadbeater's brother, in Wildwood, N.J. (Gov. Mot. at 31.) The Government argues that Richard falsely identified his employer as Lead 1 Investments as well as his monthly income, and that, when the lender phoned to verify the employment information, the lender spoke with the "CEO of Lead One Investments, 'John,' at a cellular telephone number subscribed to by defendant John Leadbeater, who falsely confirmed that

26

Richard Leadbeater was employed by Lead One Investments . . . ."
(Id. at 31-32.) The Government argues that this evidence will be
introduced for the purpose of proving intent, plan, knowledge
and absence of mistake or accident, because it tends to show
that Leadbeater knew how to commit mortgage fraud and that he
was not the dupe that he may claim to be. (Id. at 33.) The
Government also argues that this evidence helps explain "the
formation and development of the relationship between John
Leadbeater and Deborah Hanson [an alleged co-conspirator who
worked at New Century Mortgage Co., where Richard obtained a
mortgage] and shows each party's knowledge that they engaged in
an elaborate fraud to defraud lenders." (Id. at 35.) The
Government contends that this evidence "bears directly on an
element of the charged crimes -- intent . . . ." (Id. at 36.) At
oral argument, the Government also argued that this is not
cumulative of evidence in the prosecution's case-in-chief,
because it tends to show Defendant Leadbeater's personal
involvement in direct deception of lenders.

Second, in a separate motion, the Government seeks
admission of evidence regarding a February 21, 2007 purchase of
Unit 204 at 5501 Atlantic Avenue in Wildwood Crest for $659,000.
(Gov. Second Mot. [Docket Item 44] at 1.) The Government argues
that the final settlement shows that Leadbeater received
$130,555 at settlement "as a 'pay as directed' payment" and that

27

there was "no legitimate reason to receive such payment." (*Id.*
at 1-2.) The Government similarly contends that this proves
intent, plan, knowledge and absence of mistake, and makes more
probable that he intended to defraud lenders in this case. (*Id.*
at 4, 6.) The Government argues that while Leadbeater may try to
explain his kickbacks as "finder's fees," he would not have been
entitled to a finder's fee for finding himself, when he was the
purchaser.

Leadbeater responds that the evidence is unnecessary and
cumulative. (Leadbeater Opp'n at 15.) He argues that there are
26 separate transactions charged in the indictment where
Leadbeater is alleged to have committed fraud, and so the
Government has ample opportunity to prove allegations without
resorting to a 27th or 28th transaction. (*Id.*) Regarding the
March 2006 purchase, he argues that Richard did not implicate
his brother in any fraud in an interview with the FBI and denied
knowledge of the submission or involvement with Deborah Hanson.
(*Id.* at 16.) Leadbeater denies having a conversation about his
brother's employment by telephone. (*Id.*) In the alternative,
Leadbeater requests a Rule 104 evidentiary hearing to avoid
potential for prejudice. (*Id.*) Regarding the February 2007
purchase, Leadbeater argues that "[t]here is no allegation a
fraudulent loan application was made in connection with this
transaction." (Leadbeater Second Opp'n [Docket Item 47] at 1.)

He explains that the payment in question was listed on the HUD, and there is "no indication that the mortgage payments were not made and that the lender lost any money as a result of this transaction." (Id.) He argues that the February 2007 transaction is not evidence of wrongdoing and is not being offered for a proper purpose. (Id. at 2.)

Under Rule 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The Court will exclude this evidence under Rule 403. The evidence is potentially probative of Defendant Leadbeater's intent and knowledge of fraud, and lack of accident or mistake. However, in the Richard Leadbeater transaction, Defendants dispute whether the "John" at Lead One was, in fact, John Leadbeater. Defense counsel represented to the Court at argument that John Leadbeater denies ever having such a conversation. Defendant argues that there is no alleged fraud in the 5501 Atlantic Avenue transaction, that the bank was paid off and that the payment to Leadbeater was not reflected as a finder's fee. The 5501 Atlantic Avenue transaction, furthermore, is not the only transaction in which Leadbeater served as the purchaser, although the Government contends it is the only one with an "as

29

directed" payment to Leadbeater's company. It appears that a Rule 104 hearing would be required for both of these transactions to determine whether the Richard Leadbeater verification call involved John Leadbeater and what the nature of the payment to Leadbeater's company was in a transaction that is not identified as fraudulent in the Superseding Indictment. Rule 104 hearings to determine the admissibility of the Rule 404(b) evidence would be needlessly wasteful for the Court and the parties, in light of the 26 transactions already named in the indictment. The benefits of proving a 27th and 28th transaction would seem negligible compared with the consumption of time and the redundancy. The Richard Leadbeater transaction evidence may show John Leadbeater playing a different role than normal in this alleged conspiracy, but the evidence is largely cumulative of that for the 26 alleged transactions in the Superseding Indictment. In aggregate, evidence of the named transactions could tend to negate a claim of accident or mistake, and illuminate Leadbeater's intent and knowledge many times over. As the 27th and 28th real estate transactions presented in this case, the probative value of the proposed Rule 404(b) evidence is marginal and does not outweigh the wastefulness of a Rule 104 hearing or the cumulative nature of the evidence. The Government's motion is denied without prejudice.

The Court will permit the Government to renew this motion at trial, if the quantum of evidence actually adduced at trial renders this evidence <u>not</u> needlessly cumulative. For instance, if the Government adduces evidence of a reduced number of transactions, thereby rendering the additional evidence of Leadbeater's knowledge and intent vital to the Government's case and, therefore, less wasteful to hold a Rule 104 hearing, the Court will revisit this issue upon the Government's motion.

## IV.  CONCLUSION

An accompanying Order will be entered.

**February 10, 2015**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge